UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

        Case Number 04-CR-20026-BC
        Honorable David M. Lawson

TIMOTHY E. WIRTH,

        Defendant.
_____/

**OPINION AND ORDER ADJUDICATING CONTROVERTED SENTENCING ITEMS**

The defendant, Timothy E. Wirth, stands before the Court convicted on his pleas of guilty to two counts of a nineteen-count indictment that charged various fraud, currency transactions and tax offenses. He awaits sentencing under a plea agreement that provides, among other things, that the activity that led to the charges in all of the counts is to be considered relevant conduct when computing the applicable advisory Sentencing Guideline range. Wirth has filed objections to the calculation of the offense level, primarily based on the loss amount used to enhance the base offense level. The government has filed a responsive sentencing memorandum, and the parties each have supplemented their submissions to the Court on various occasions. The Court held a sentencing hearing on August 24, 2005, and the parties thereafter submitted additional memoranda.

The offenses arise from Wirth's submission of false documentation relating to his assets and net worth in support of loan applications to four lending institutions: Franklin Bank, National City Bank, Michigan National Bank, and Equity Funding, Inc. (a private lender). The Equity Funding, Inc. loan did not lead to a charged offense; it is characterized as uncharged relevant conduct. The misrepresentation concerned Wirth's ownership of certain mobile home parks, which he falsely represented as his solely-owned, unencumbered assets. The government also charges that Wirth

failed to pay taxes on income from two of the properties in 1997 and 1998, and that Wirth engaged in unlawful currency transactions with respect to these loan proceeds.

A presentence investigation report (PSR) was prepared; it calculates the offense level using the November 1, 2004 edition of the *Sentencing Guidelines Manual*. The investigator determined the fraud loss amount based on the loan proceeds generated by each of the transactions, for a total of $2,180,000. The loss amounts for the tax violations were determined to be $50,479.40.

Wirth filed objections to the PSR. He contends that (1) the amount of the fraud loss should be $0 because the loans were fully collateralized and the banks were paid in full when the mobile home properties were acquired by Stanley van Reken, who paid all the outstanding debt; (2) the tax loss should be $0 because Wirth did not own the two income-producing properties during 1997 or 1998 and therefore had no obligation to pay taxes; (3) an earlier version of the *Sentencing Guidelines Manual* should have been used to calculate the offense level because it corresponded to the dates of the offenses and would result in a more favorable outcome for the defendant (unless the loss amounts are found to be as recommended in the PSR or other enhancements are found to apply, in which case the 2004 edition is the appropriate version); and (4) the money laundering counts should not be viewed as relevant conduct because no offense occurred when the banks disbursed the loan proceeds into accounts at the same institutions against which they had offset privileges in the event of loan defalcations. The defendant supported his allegation of non-ownership with respect to the tax counts with copies of land transfer instruments that show the defendant divesting himself of ownership during the relevant period (1997 and 1998) and reacquiring the properties thereafter.

The government responds by arguing that the defendant is not entitled to credit against the fraud loss amount for sums paid by Mr. van Reken because the payments were not made "before the offense was detected." U.S.S.G. § 2B1.1, comment. (n.3(E)(i)). As for the tax loss amount, the government contends that the land contract documents submitted by Wirth are forgeries. The government argues, therefore, that Wirth should be denied a reduction in offense level for acceptance of responsibility and suffer an enhancement for obstruction of justice.

*A. Fraud Loss Amount*

For offenses involving fraud or deceit, the offense level is determined under U.S.S.G. section 2B1.1 by the established base offense level of 7, plus an enhancement determined by the amount of "the loss." The loss amount is to be determined by reasonably estimating the actual or intended loss to the victim; it is not to be based solely on the amount of the loan proceeds. *See United States v. Chichy*, 1 F.3d 1501, 1508 (6th Cir. 1993) (stating that "loss calculation . . . in cases of fraudulently induced bank loans should be based on the 'actual' or 'expected' loss rather than on the face value of the total amount of the loan proceeds"), *superseded on other grounds by* U.S.S.G. § 1B1.1, cmt. (n.4) (Nov. 1 1993). According to the *Sentencing Guideline Manual*, "'[a]ctual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. (n.3(A)(i)). "Pecuniary harm" is defined as "harm that is monetary or that otherwise is readily measurable in money." *Id.* at n.3(A)(iii).

According to the PSR, Wirth applied for a loan with Franklin Bank on November 16, 1995. In support of the application, Wirth represented that he owned free and clear a mobile home park valued at $1,350,000 (the Landmark Mobile Home Park), when in fact Wirth possessed a land contract vendee's interest in the property and owed the seller over $400,000; his monthly payments

were in arrears. Wirth presented a deed from the seller conveying the property to Wirth, but the deed was a forgery. The bank granted the loan and transferred $350,000 into Wirth's account at the bank. Wirth repeated these misrepresentations to Franklin Bank to obtain succeedingly larger loans on February 25, 1997 and October 15, 1997, with the proceeds used in part to pay off the earlier debts. The last loan was for $950,000.

On June 15, 1998, Wirth supported an application for a $30,000 loan from Franklin Bank with a forged 1997 federal income tax return. That loan apparently was made. Then on February 25, 1999, Wirth submitted a loan application to Michigan National Bank representing that he owned the White Birch Mobile Home Park worth $1,800,000 free and clear, when in fact he possessed no more than a land contract vendee's interest in the property on which substantial balances were owed. Wirth recorded a forged deed purportedly from the seller. The bank made a $500,000 loan. On April 6, 1999, Wirth obtained a line of credit from Michigan National Bank using a forged, unfiled federal tax return to verify his income. Although the credit line authorized advances up to $1,450,000, the total actually advanced was $350,000.

In September 2000, Wirth obtained a $350,000 loan from Equity Funding, Inc., a private lender, using forged 1997, 1998, and 1999 federal tax returns.

The fraudulent conduct was discovered when Alfred Shaw, the fee holder of the White Birch Mobile Home Park, contacted the Saginaw County Prosecutor's Office on February 4, 2000 to report that when he tried to sell his vendor's interest in the land contract he had with Wirth, he discovered that a deed had been recorded, which he insisted was a forgery. Shaw learned through a title company that Wirth had encumbered the property with the mortgages described above. The ensuing investigation uncovered the additional fraudulent transactions.

Wirth argues that the loan proceeds were used for business purposes and that he made payments on the loans. He also maintains that appraisals put the value of the various properties at such an amount that, when considering his fractional ownership share as a vendee under the various land contracts, the loans were fully collateralized by the value of his own legitimately-owned assets. He also contends that since his business partner, Stanley van Reken, paid off the loans in exchange for a transfer by Wirth of these interests to van Reken, there is no actual loss to the lending institutions.

Two Sentencing Guidelines application notes are pertinent here and outline the process of applying credits against a fraud loss. The first is Application Note 3(E)(i), which states:

> Loss shall be reduced by the following:
>
> (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

U.S.S.G. § 2B1.1, cmt. (n.3(E)(i)).

The second Application Note calls for reducing the amount of loss:

> In a case involving collateral pledged or otherwise provided by the defendant, [by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

U.S.S.G. § 2B1.1, cmt. (n.3(E)(ii)).

Wirth argues that under these provisions, the value of the collateral coupled with van Reken's intervention requires the application of credits that results in the reduction of the loss amount to $0.

The Court does not agree. The credit for money returned by a defendant or someone acting jointly with him applies only when payment was made before the crime was detected. For the purpose of this section, it is reasonable to conclude that the forgery and false loan application scheme came to light on February 4, 2000 when Alfred Shaw contacted the Saginaw County Prosecutor's office to report his discovery of the forged deed. Around that time or shortly thereafter, the balances for the two loans at Franklin Bank were $876,762 and $28,079; the defendant still owed approximately $470,000; and at Michigan National Bank the defendant owed $350,206.61. Michigan National seized $101,721.33 from the defendant's checking account, leaving a net balance of $248,485.28. Equity Funding, Inc. was still owed the loan balance of $350,000. The total owed at the time was $1,973,326.28.

The events that occurred thereafter are described by Stanley van Reken in an affidavit dated October 18, 2005. Van Reken avers that he was a business partner of Wirth's and owned fractional interests in various mobile home parks. He says that when Wirth received a subpoena from the United States Attorney's Office in Bay City, he and Wirth agreed that Wirth would quit claim all his interests in the parks to van Reken so that the latter could salvage his investments. *See* U.S.S.G. § 2B1.1, cmt. (n.3(E)(i)). The defendant disputes whether the transfer idea originated with him or van Reken. However, it is undisputed that van Reken then went to the various banks and purchased the outstanding loans, taking an assignment of the notes and security instruments. The banks then were made whole, but only after van Reken purchased the debts, and only after Wirth's fraudulent conduct came to light.

Although Wirth is entitled to credit on the loan payments he made in the ordinary course of business, which is reflected in the loan balances noted above, " there is no credit against a loss when

payments are made after the detection of the offense." *United States v. Swanson*, 360 F.3d 1155, 1169 (10th Cir. 2004); *see also United States v. Lucas*, 99 F.3d 1290, 1296-97 (6th Cir. 1996) (noting that "the concept of when an 'offense is discovered' relates to discovery by the victim or by the proper authorities, whichever comes first. After discovery, so defined, has occurred, amounts later repaid on a fraudulently obtained loan cannot be set off from the amount of loss"). As the Tenth Circuit has explained, "the purpose of the loss calculation under the Sentencing Guidelines is 'to measure the magnitude of the crime at the time it was committed. The fact that a victim has recovered part of its loss after discovery of a fraud does not diminish a defendant's culpability for purposes of sentencing.'" *Swanson*, 360 F.3d at 1169 (quoting *United States v. Nichols*, 229 F.3d 975, 979 (10th Cir. 2000)). The Court believes that the loan balances on the fraudulent loans at the time the crime was discovered represents an accurate measure of the actual loss for sentencing purposes.

Nor does the provision that allows a set-off for collateral help Wirth. The application note allows the loss amount to be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral" at the time of sentencing, or by the value of the collateral if it is still available to the victim. U.S.S.G. § 2B1.1, cmt. (n.3(E)(ii)). In other words, the actual loss in a fraudulent loan case is calculated by "the face value of all of the loans, minus only the value of any assets pledged to secure the loan that the banks issuing the loans could expect to recover and any repayment amounts made before discovery, to be included in the amount of loss calculation." *Lucas*, 99 F.3d at 1297.

Strictly speaking, the banks recovered nothing by way of liquidating the loan collateral. Rather, they sold the blemished paper to van Reken, who interceded, in his words, to "try to

-7-

straighten up the properties" and "try to make things right with the various people who have been offended." Gov't Sent. Memo. Ex B. Van Reken explained in his affidavit that he received assignments of the debts and tried unsuccessfully to collect them from Wirth. He sold some of the properties at a profit and others at a loss. He then sued Wirth in the name of van Reken's corporation and obtained a default judgment against him for actual damages of $1,199, 714.90, which amount was trebled under Michigan's fraud law.

The loan collateral provision in the commentary to U.S.S.G. § 2B1.1 does not apply where the defendant never intended the collateral to be used to repay the loan. *See United States v. Schild*, 269 F.3d 1198, 1201-02 (10th Cir. 2001). "Intent is a question of fact for the sentencing court to be determined on a case-by-case basis." *Ibid.* In this case, it is apparent that Wirth agreed to deed his interest in the mobile home parks to van Reken to settle matters with his business partner, that is, so that van Reken could "salvage his investment." Aff. of S. van Reken at ¶¶ 4, 18, 24. Moreover, the loan collateral itself was defective. The mortgages were based on fraudulent deeds, and the banks could not have foreclosed successfully without substantial litigation that involved the true owners of the property. The coercive power of the courts would have been required to convert the banks' interests in the property, whatever it might have been determined to be after sorting through the defective chain of title, into cash. "Recovery of fraudulently obtained money or property by the coercive actions of the state, whether these actions occur years after or immediately after the fraud is discovered, cannot be used to reduce the amount of loss. Whatever mechanism the government uses to assist recovery after a fraud is discovered, the scope of the defendant's fraud remains unaltered." *Lucas*, 99 F.3d at 1299.

The Court finds that the defendant did not intend the collateral to be used by the financial institutions to pay his debts. The Court concludes, therefore, that the defendant's controverted items 1, 2, 4, and 5 should be decided against him. The fraud loss amount for sentencing purposes will be $1,973,326.28.

## B. *Tax Loss Amount*

Wirth also objects to the calculation of the tax loss amount in the PSR at $50,479.40. The government contends that Wirth owned an interest in and received income from the Bayside and Myrtle Grove Mobile Home Parks. He failed to report that income resulting in a tax loss of $9,691 for 1997 and $40,788.40 for 1998. Wirth contends that he had sold his interests in those properties and did not have an obligation to report that income in 1997 or 1998. He acknowledges that he reacquired the properties thereafter.

The determination of this controverted item will have no effect on the calculation of the offense level in this case. If the Court were to accept the tax loss as reported in the PSR, the corresponding offense level would be 14. *See* U.S.S.G. §§ 2T1.1, 2T4.1. Because the Court determined that the fraud loss amount exceeds $1.5 million, the resulting offense level for the fraud grouping will be more than nine levels higher, and therefore the tax grouping is to be disregarded. *See* U.S.S.G. § 3D1.4(c). The Court, therefore, need not resolve that issue.

The government claims, however, that Wirth submitted fraudulent documents in support of his argument that he divested himself of his interest in the properties for the relevant period. After reviewing the submissions, the Court is satisfied that such is not the case. The Court accepts the testimony of Susan Weaver as to the creation of the duplicate land contract, and the Court does not find that Weaver's tax documents are false or fabricated. Therefore, the Court finds no basis to

withdraw the reduction for acceptance of responsibility or to impose an enhancement for obstruction of justice.

### C. *Applicable Version of the Sentencing Guidelines Manual*

Under 18 U.S.C. § 3553(a)(4), a sentencing court is to apply the version of the Guidelines in effect on the date of sentencing. *See United States v. Kussmaul*, 987 F.2d 345, 350 (6th Cir.1993). However, the Ex Post Facto Clause of the Constitution "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." *Id.* at 351. When an amendment to the Guidelines "changes the legal consequences of the acts completed before its effective date" to the defendant's detriment, the Ex Post Facto Clause requires application of the Guidelines in effect at the time the crime was committed. *Id.* at 351-52 (quoting *Miller v. Florida*, 482 U.S. 423, 430 (1987)).

The defendant argues that the offenses in this case occurred before the 2001 amendment that required the use of U.S.S.G. § 2B1.1 to fraud offenses; before that date, use of section 2F1.1 was mandated. The defendant argues that the November 1, 2000 version of the Manual should be used. The defendant's factual premise is not entirely accurate, however. The defendant pleaded guilty to two offenses stated in the third superseding indictment: making false statements in a bank loan application (count 5), and making false statements in a partnership U.S. tax return (count 19). Count 5 alleges that the offense occurred on February 25, 1999. The offense in count 19 occurred on September 19, 2003. "If the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." U.S.S.G. § 1B1.11. Therefore, the November 1, 2002 version of the *Sentencing Guidelines Manual* would be the version the Court

must consult to determine the defendant's *ex post facto* challenge. To determine whether there is a detriment to the defendant, calculation of the offense level under the respective Sentencing Guidelines Manual versions must be done.

The PSR calculated the offense level using the November 1, 2004 version as follows:

| | |
|---|---:|
| Base offense level per 2B1.1(a)(1) | 7 |
| Loss amount exceeding $1.5 million per 2B1.1(b)(1)(I) | +16 |
| Receipt of more than $1 million from financial institution per 2B1.1(b)(13)(A) | + 2 |
| Multiple Count Adjustment per 3D1.4(c) | + 0 |
| Acceptance of responsibility per 3E1.1(a) & (b) | – 3 |
| **Net Offense Level** | **22** |

Under the November 1, 2002 version of the Sentencing Guidelines Manual, the calculation is:

| | |
|---|---:|
| Base offense level per 2B1.1(a)(1) | 6 |
| Loss amount exceeding $1.5 million per 2F1.1(b)(1)(M) | +16 |
| The defendant derived more than $1 million in gross Receipts from one or more financial institutions per 2B1.1(b)(12)(A) | +2 |
| Multiple Count Adjustment per 3D1.4(c) | +0 |
| Acceptance of responsibility per 3E1.1(a) & (b) | – 3 |
| **Net Offense Level** | **21** |

The relative calculations demonstrate that the defendant would fair better under the earlier version of the Guidelines Manual. The changes made are not simply clarifying amendments, but rather effectuate substantive changes. *See United States v. DeCarlo*, 434 F.3d 447, 459 (6th Cir. 2006). The Ex Post Facto Clause requires the use of the November 2002 version.

### D. *Costs of Prosecution*

The defendant also objects to paragraph 61 of the PSR, which recommends an assessment of the costs of prosecution totaling $38,250. That recommendation is based on the defendant's conviction under 26 U.S.C. § 7206, which authorizes a penalty of a fine and imprisonment, "together with the costs of prosecution." The defendant contends that the Court's authority to award costs is

limited by 28 U.S.C. § 1918(b), which states that "[w]henever any conviction for any offense not capital is obtained in a district court, the court may order that the defendant pay the costs of prosecution." Courts that have considered the issue agree that costs of prosecution parallel the costs that are taxable in civil cases. For instance, in *United States v. Banks-Giombetti*, 245 F.3d 949 (7th Cir. 2001), the court held that "[t]he costs that may be assessed [under section 1918(b)] must be authorized by statute . . . and every court to address the issue has held that, absent some other explicit statutory authority, 28 U.S.C. § 1920 provides the costs of prosecution that a court may assess under § 1918(b)." *Id.* at 953 (citations omitted); *see also United States v. Hiland*, 909 F.2d 1114 (8th Cir. 1990); *United States v. Hoffa*, 497 F.2d 294 (7th Cir. 1974); *United States v. Procario*, 361 F.2d 683 (2d Cir. 1966).

> Section 1920 states:
>
> A judge or clerk of any court of the United States may tax as costs the following:
> (1) Fees of the clerk and marshal;
> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920. In *United States v. Vaughn*, 636 F.2d 921, 922 (4th Cir. 1980), the court noted "that assessment of the 'costs of prosecution' against a defendant under § 7201 or § 1920 does not include investigation expenses."

There is no explanation in the PSR of the components of the cost total recommended. The report merely states that the sum was furnished by the Assistant United States Attorney. The Court,

therefore, will direct the probation officer to report on the items that comprise the cost total in this case.

### *E. Conclusion*

The Court determines that the net offense level for purposes of applying the sentencing guidelines to the sentence in this case is twenty-one. Wirth falls within criminal history category I. His advisory sentencing guidelines range is 37 to 46 months.

It is so **ORDERED**.

It is further **ORDERED** that the United States Probation Department provide an explanation of the cost total in paragraph 61 PSR.

It is further **ORDERED** that the parties shall appear before the Court for sentencing on **August 23, 2006 at 3:30 p.m.** to complete the sentencing hearing.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated: July 13, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 13, 2006.

s/Tracy A. Jacobs  
TRACY A. JACOBS